**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JANICE L. MALKOFF, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

GREGG L. ENGLES,
MICHELLE GOOLSBY,
STEPHEN L. GREEN,
JOSEPH S. HARDIN, JR.,
ANTHONY J. MAGRO,
W. ANTHONY VERNON,
DOREEN A. WRIGHT, and
THE WHITEWAVE FOODS COMPANY

      Defendants.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Janice L. Malkoff ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which is alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.    This is a stockholder class action brought by Plaintiff on behalf of holders of the common stock of  The WhiteWave Foods Company ("WhiteWave" or the "Company") against the Company and its board of directors (the "Board")  for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules and Regulations promulgated thereunder, including Rule 14a-9, in connection with the proposed acquisition of WhiteWave by the French company Danone S.A. ("Danone") through its newly formed Delaware

company July Merger Sub, Inc. ("Merger Sub") through a merger transaction, as detailed herein (the "Proposed Transaction").

2.      On July 6, 2016, WhiteWave and Danone jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby WhiteWave will merge with and into Merger Sub  (the "Merger"), with WhiteWave  surviving as a wholly-owned subsidiary of Danone.   The Merger was unanimously approved and adopted by the Board of Directors of WhiteWave.   Pursuant to the Merger, each issued and outstanding share of WhiteWave common stock will be cancelled and automatically converted into the right to receive $56.25 in cash ("Merger Consideration").   The total value of the Proposed Transaction is $10.1 billion.

3.      Defendants (defined below) violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC"), by filing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy") with the SEC on July 29,  2016.  The Proxy recommends that WhiteWave stockholders exchange their shares pursuant to the terms of the Merger Agreement based among other things on the opinion rendered by the Company's financial advisor, Goldman, Sachs & Co. ("Goldman") and other internal and external factors the WhiteWave Board purportedly considered to make the recommendation.

4.      The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to WhiteWave's public stockolders.  The Company has consistently announced positive financial results in recent quarters.  Indeed, for the first quarter 2016, the Company reported net sales of $1.0 billion, a 14% increase from net sales of $911 million for the first quarter 2015.  Just last year the stock was trading over

$50 per share and in 2016 the stock price had increased approximately 30% from the start of the year.

5.      One investor, Ampera Capital publicly stated prior to the release of the 14A, that if the Company failed to run a market check, then other bidders could seek to improve the offer price.[1]  In fact, as discussed further below, no market check was conducted by the Board despite analysts' identification of well-known companies that were potential acquirers of the Company, including Coca-Cola, Nestle, Campbell Soup, and General Mills.[2] Thus, the Merger Consideration is, obtained without taking any steps to seek higher value, is inadequate and does not reflect the value of the Company or the fair value of WhiteWave stock.

6.      The inadequate Merger Consideration is reflective of the failure of the Board to conduct a proper sales process.  The process to sell the Company to Danone was driven by WhiteWave Chief Executive Officer ("CEO") and Chairman of the Board, the defendant Gregg L. Engles, also using Edward F. Fugger ("Fugger"), the Executive Vice President, Strategy & Corporate Development of WhiteWave as a conduit to engage Danone.  Engles started the process by raising a strategic transaction between the two companies in early 2016 with Danone CEO, Emmanuel Faber, apparently without Board approval or knowledge.  Driven to wrap up the sale quickly in part by the potential threat of a proxy contest by activist fund Hudson Executive Capital in the first half of 2016, Engles negotiated exclusively with Danone for a deal that will see him cash out his otherwise illiquid equity holdings in the Company to the tune of $24.7 million and a board seat on Danone.  Other insiders also will be able to cash out their equity holdings (e.g.,

---

[1] http://marketrealist.com/2016/07/whitewave-deal-get-competitive/?utm_source=
yahoo&utm_medium=feed&yptr=yahoo.
[2] http://realmoney.thestreet.com/articles/06/04/2016/whitewave-foods-could-become-activist-or-takeover-target.

options, restricted stock units and performance share units) for values ranging from $2.5 million to $7.8 million.

7.      In addition to the accelerated vesting of their equity holdings, WhiteWave insiders and officer will receive cash severance payments under the Company's change in control agreements. Engles will receive approximately a $8.4 million payment. Fugger will receive a $2.4 million payment. Other officers will receive payments ranging from $2.4 to $4.5 million.

8.      According to SEC filings for the Company's last annual stockholder meeting on May 12, 2016, the Company directors and executive officers who will receive the above-described cash payouts beneficially own 6.2% of the outstanding WhiteWave shares and therefore will influence the approval of the Merger and their lucrative payouts.

9.      To ensure the success of the Proposed Transaction, the WhiteWave Board of Directors (the "Board") locked up the deal by agreeing to impermissible "deal-protection" devices, effectively rendering the Proposed Transaction a *fait accompli*.  For example, the Board agreed to: (i) a "no-shop" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (ii) a provision mandating that the Company must inform Danone if it receives a competing bid and provide Danone with all information about the bid; (iii) before taking action on a bid that is a superior proposal from another potential acquirer, give Danone three business days to match the superior proposal; and (iv) a $310 million termination fee to be paid to Danone if the Board agrees to a competing superior proposal.

10.     In pursuing the plan to facilitate Danone's acquisition of WhiteWave for grossly inadequate consideration, through a flawed process, the Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and regulations thereunder, by causing the materially incomplete and

misleading Proxy to be filed with the SEC on July 29, 2016. The Proxy recommends that WhiteWave stockholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information which renders the Proxy misleading.

11. Specifically, the Proxy contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction; (ii) the Company's internal financial data forecasts; and (iii) the financial analyses of the Proposed Transaction performed by Goldman Sachs.

12. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

<u>JURISDICTION AND VENUE</u>

13. Pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. 17 C.F.R. §240.14a-9.

14. The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because WhiteWave maintains its primary place of business in this District.

## THE PARTIES

16.     Plaintiff is, and at all relevant times was a stockholder of Defendant WhiteWave since prior to the wrongs complained of herein.

17.     The WhiteWave Foods Company is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 1225 Seventeenth Street, Suite 1000, Denver Colorado 80202.  As reported in its SEC filings, the Company manufactures markets and sells branded plant-based foods and beverages, coffee creamers and beverages, premium dairy products and organic produce.  The Company went public in 2012 and since then has traded on the New York Stock Exchange under the symbol "WWAV."

18.     Defendant Gregg L. Engles is the CEO and has served as a director since August 2012 and is the Chairman of the Board.  Engles previously served as the CEO of Dean Foods Company.

19.     Defendant Michelle Goolsby has been a director of WhiteWave since November 2012.  Goolsby is a Venture Partner and a member of the Investment Committee of Greenmont Capital Partners, a private equity firm based in Boulder, Colorado.

20.     Defendant Stephen L. Green has been a director of WhiteWave since August 2012.  Green formerly was a partner with a venture capital firm called Canaan Partners and also was a board member of Dean Foods.  Green has extensive background with corporate financial statements, purportedly having analyzed hundreds of them.

21.     Defendant Joseph S. Hardin, Jr. has been a director of WhiteWave since August 2012.

22.     Defendant Anthony J. Magro has been a director of WhiteWave since January 11, 2016.  Magro works at the investment banking firm Evercore, and before that worked at Bank of

America, Merrill Lynch, and Bear, Stearns & Co.  Prior to that, he worked in mergers and acquisitions at Kidder, Peabody & Co. and Dillon, Read & Co.

23.     Defendant W. Anthony Vernon has been a director of WhiteWave since January 2016.  Vernon worked for many years at Kraft Foods, and also has worked in private equity at Ripplewood Holdings, LLC.

24.     Defendant Doreen A. Wright has been a director of WhiteWave since August 2012.

25.     The Defendants above are collectively referred to hereinafter as the "Individual Defendants."

26.     Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

27.     Collectively, the Individual Defendants, WhiteWaveare referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

28.     Plaintiff bring this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of WhiteWave common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

29.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of April 30, 2016 WhiteWave had outstanding approximately 176,918,229 shares of Common Stock. Class members are believed to be geographically dispersed.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(d)     To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

30.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act, Rule 14a-9, or other SEC rules that apply to the disclosure of WhiteWave financial data to Company stockholders in the Proxy;

(b)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

**SUBSTANTIVE ALLEGATIONS**

**A.**    **Background**

31.    WhiteWave started out as a vegetarian and organic food company in 1977. Its primary product was the Silk soymilk brand. After years of growth, it was acquired by Dean Foods. The Company was spun off in an IPO in August 2012. Engles, the former CEO of Dean Foods, and other former Dean Foods executives went with WhiteWave when it became a publicly-traded company in 2012.

32.    The Company acquired Earthbound Farms at the beginning of 2014. Earthbound Farms was one of the largest growers of organic produce.

33.    As disclosed in SEC filings, the Company claims it "is a  leading consumer packaged food and beverage company that manufactures, markets, distributes, and sells branded plant-based foods and beverages, coffee creamers and beverages, premium dairy products and organic salads, fruits and vegetables throughout North America and Europe. We also hold a 49% ownership interest in a joint venture that manufactures, markets, distributes, and sells branded plant-based beverages in China. We are focused on providing consumers with innovative, great-tasting food and beverage choices that meet their increasing desires for nutritious, flavorful, convenient, and responsibly-produced products. Our widely-recognized, leading brands distributed in North America include *Silk, So  Delicious* and *Vega* plant-based  foods  and beverages, *International Delight* and *LAND O LAKES* coffee creamers and beverages, *Horizon*

*Organic and Wallaby* premium dairy products and branded macaroni and cheese and snack foods, and *Earthbound Farm* organic salads, fruits and vegetables. Our popular plant-based foods and beverages brands in Europe include *Alpro* and *Provamel*, and our plant-based beverages in China are sold under the *Silk ZhiPuMoFang* brand."[3]

34.     The Company sells its products primarily across North America and Europe to a variety of customers, including grocery stores, mass merchandisers, club stores, health food stores and convenience stores, as well as through various away-from-home channels, including restaurants and foodservice outlets. WhiteWave sells products primarily through a direct sales force, independent brokers, regional brokers and distributors.

35.     WhiteWave has an extensive production and supply chain footprint and utilizes 11 production facilities and also rely on third-party co-packers to fulfill manufacturing needs in the U.S. In Europe, it has strategically positioned three plants in the United Kingdom, Belgium, and France, each supported by an integrated supply chain, and also utilizes third-party co-packers. Furthermore, we utilize a broad commercial partner network to access certain markets in Europe, in addition to our own sales organizations in the United Kingdom, Belgium, Germany, and the Netherlands.[4]

36.     In 2015, WhiteWave's business was organized into three operating and reportable segments, Americas Foods & Beverages, Americas Fresh Foods and Europe Foods & Beverages, based on its go-to-markets strategies, customer bases, and the objectives of its businesses. The Company's segments were created by Engles based on his view of operating performance,

---

[3] SEC Form 10K at www.sec.gov/Archives/edgar/data/1555365/000155536516000038/wwav-20151231x10k.htm#s2384992AAFC16BB5D47CDD3FE8A88483.
[4] *Id.*

allocation of resources, and deployment capital. In 2016, the Company reorganized its segments to report the business operations of the Americas Fresh Foods segment with the Americas Foods & Beverages segment. [5]

37.     The Company in recent years has grown through an active acquisitions initiative. In addition to the Earthbound Farms acquisition, the Company acquired So Delicious Dairy Free at the end of 2014 for $196.6 million. Delicious Dairy focused on plant-based food and beverage products.  In 2015, WhiteWave acquired Magicow and other brands from EIEIO, Inc.  Magicow manufactures, markets and distributes bulk, bag-in-box and shelf stable creamers, coffee beverages and whip toppings.  On August 30, 2015, the Company acquired Wallaby Yogurt Company, Inc. for approximately $122.3 million in cash, incurring even more acquisition debt to finance the transaction. Wallaby is a leading manufacturer and distributor of organic dairy yogurt products including Greek and Australian style yogurts and Kefir beverage. [6]

38.     Before announcement of the Proposed Transaction, WhiteWave stock had increased approximately 30% from the start of the year.  It had reported consistently profitable earnings and was beat analysts' estimates in consecutive quarters. [7]

**B.**     **The Proposed Transaction and the Flawed "Process"**

39.     On July 7, 2016, WhiteWave and Danone issued a joint press release announcing the Proposed Transaction which stated:

**Danone to Acquire WhiteWave, a USD 4 bn sales Global Leader
in Organic Foods, Plant-based Milks and related products**
*Transaction price $56.25 per share in cash*

---

[5] *Id.*
[6] *Id.*
[7] www.dailycamera.com/boulder-business/ci_27511021/whitewave-foods-shares-rise-earnings-beat-estimates; www.thestreet.com/story/13565497/1/whitewave-foods-wwav-stock-soars-on-q1-earnings-beat-jim-cramer-rsquo-s-view.html.

- A perfect match of vision, culture and businesses
- Creates a truly unique global leader strongly aligned with consumer trends for healthier and more sustainable eating and drinking options
- Significantly enhances Danone 2020 plan, serving the ambition for an Alimentation revolution
- Immediately accelerates Danone journey towards strong sustainable and profitable growth by 2020
- Doubles the size of Danone's US business
- Provides compelling value for WhiteWave's shareholders

STRONG VALUE CREATION

- High profitable growth in stable geographies
- Significant run-rate EBIT synergies of $300mln by 2020, representing 8% of WhiteWave 2015 sales and 80% of WhiteWave 2015 EBIT
- Strong value creation, solid EPS accretion in the first year after closing
- 100% debt financed
- Expected to maintain strong investment grade profile
- Closing expected by year end

**Paris, France and Denver, Colorado, U.S**. — July 7, 2016 — Danone and The WhiteWave Foods Company ("WhiteWave") today announced that they have entered into a definitive merger agreement under which Danone will acquire WhiteWave for $56.25 per share in an all-cash transaction, representing a total enterprise value of approximately $12.5 bn, including debt and certain other WhiteWave liabilities. The transaction has been unanimously approved by the Board of Directors of both companies. Its price represents a premium of approximately 24 percent over WhiteWave's 30-day average closing trading price ($45.43). The transaction is expected to close by the end of the year, subject to the approval of WhiteWave's shareholders, regulatory approvals, and customary conditions. WhiteWave is a global company which generated $4 bn in sales in 2015 and has a portfolio of large and leading branded platforms in North America and Europe in high-growth, on-trend food and beverage categories which focus on Premium Organic Dairy, non-GMO, Plant-based alternatives to milk & yogurt, Fresh Foods, and Coffee Creamers. With a strong entrepreneurial spirit, WhiteWave has a successful track record of transforming categories and creating large scale brands. WhiteWave's business includes highly recognized, category leading brands such as Silk®, So Delicious®, Vega™, Alpro®, Provamel®, Horizon Organic®, Wallaby Organic®, Earthbound Farm® and International Delight®. Since becoming a public company in 2012, WhiteWave sales have increased at a 19

percent compound annual growth rate through 2015, and WhiteWave has doubled its operating income during this period. Together, WhiteWave and Danone will create a truly unique global leader committed to addressing tomorrow's consumer trends by providing healthy and sustainable eating and drinking options. "At Danone, we constantly seek to align our vision of the world, our mission and our businesses: we believe we have a special responsibility, as expressed in our Manifesto, to help and support people in adopting healthier and more sustainable eating and drinking practices and constantly evolve our portfolio of brands and products to achieve this objective. To that extent, we found in WhiteWave the perfect alliance as we both believe in a healthier future and are conscious of our power to lead society forward", said Emmanuel FABER, Danone Chief Executive Officer. "This unique combination positions us better to address tomorrow's consumer trends and represents a great opportunity to step change the ambition of our plan for an Alimentation revolution and to accelerate our path towards strong sustainable and profitable growth by 2020. It will allow us to enhance Danone's growth profile and reinforce our resilience through a broader platform in North America. We are convinced that combining with WhiteWave will create significant value for all of our stakeholders."

Franck RIBOUD, Danone Chairman said: "I believe this acquisition advances Danone's mission and rich history of being at the forefront of emerging consumer trends and commitment to creating economic and social value. The Danone Board of Directors and Strategy Committee unanimously approved this transaction. We believe WhiteWave's size, positioning and geographical footprint fit perfectly with Danone's strategy and that it is the right transaction at the right time. The Danone Board will propose that shareholders approve the appointment of Gregg ENGLES, WhiteWave Chairman and Chief Executive Officer as a member of our Board upon completing the transaction as we pursue our ambitious vision together." Gregg ENGLES, WhiteWave Chairman and Chief Executive Officer, said: "Today's announcement is an exciting next chapter for WhiteWave, bringing together two leading companies with a shared mission of changing the way the world eats for the better. We believe this is a compelling transaction that delivers significant cash value to our shareholders. Danone is a unique company with distinctive capabilities that will enable WhiteWave to reach its next phase of growth. Danone is a great cultural fit for our organization and I am excited for our employees to benefit from the opportunities presented by joining Danone, a leading global food company and the ideal strategic partner to support our future. I am pleased to be joining Danone's Board to assist with the exciting and unique journey combining our two companies."

This transaction represents a key opportunity to enhance Danone's growth profile and enriches WhiteWave's opportunities. The strategic and financial benefits of Danone's acquisition of WhiteWave include:

• Creating a leader strongly aligned with consumer trends for healthier and sustainable eating and drinking options: WhiteWave is well positioned in high growth categories that are supported by strong secular trends. Organic foods and beverages and non-GMO plantbased alternatives to milk and yogurt are among the fastest growing categories in the industry. WhiteWave has been the fastest growing food and beverage company in the United States and one of the fastest growing in Europe for the past four years. In joining Danone, WhiteWave will have the opportunity to continue its industry-leading growth as part of a larger global company with substantial financial, geographic and operational resources. Upon closing the transaction, Danone will have one of the most extensive portfolios of brands and products in fresh dairy, organic foods and beverages and plantbased alternatives to milk & yogurt.

• Building a stronger North America platform: This transaction further diversifies Danone's portfolio and broadens its presence in North America. The transaction will create a leading U.S. refrigerated dairy player, as well as one of the top 15 largest U.S. Food and Beverage manufacturers. Following the closing of the transaction, Danone's North America footprint would increase from 12 to 22 percent of Danone' total portfolio.

• Driving strong value and delivering attractive financial benefits. By building on its resources, scale, distinctive R&D and marketing capabilities, and route to market expertise especially in the chilled category, Danone will have significant opportunities to support WhiteWave's continued growth while also realizing significant sales growth and cost synergies. Danone expects the transaction to be solidly accretive to Danone's earnings within the first year after closing and to be above 10 percent accretion based on expected run-rate synergies. The transaction is expected to result in approximately $300mn of EBIT synergies by 2020.[8]

---

[8] www.sec.gov/Archives/edgar/data/1555365/000119312516642888/d220423dex991.htm.

40.     The process that led to this announced Proposed Transaction was flawed from the beginning. Indeed, there was not a process at all –Engles and Fugger negotiated solely and exclusively with Danone.  Part of the payoff to Engles will be a new board seat with Danone[9]

41.     The Proxy describes a fundamentally flawed process in which the Board failed to contact any other entity about the sale of the Company and engaged only with Danone.  The Company has filed the false and misleading Proxy to obscure and obfuscate its actions and inactions.

42.     Thus, on September 9, 2015, Engles and Fugger attended Danone's presentation at an industry conference, after which Engles spoke with Faber to set up a meeting.  That meeting occurred on January 14, 2016 in Paris. Engles raised the possibility of strategic transactions involving WhiteWave and Danone and the two discussed the merits of various strategic transactions involving the companies, including some form of business combination   The investment banking firm Lazard Frères SAS, which together with Lazard Frères & Co. LLC (referred to together as "Lazard") represented Danone later contacted Fugger  to discuss among other things Fugger's meeting with Danone's new Chief Financial Officer, Cécile Cabanis. Proxy 26. Cabanis and Fugger later met on March 8, 2016 in New York City and discussed the potential for Danone to acquire WhiteWave, among other topics.  Cabanis informed Fugger that Danone would not participate in a process if other bidders for WhiteWave also were involved.  Proxy 27. Thus, Danone effectively informed Fugger early on hat it sought exclusivity.  The Proxy fails to disclose whether the Board at this time was aware of Engles' and/or Fugger's meetings and discussions with Danone representatives and/or whether either of them Board authorization to discuss a sale of WhiteWave had.

---

[9] www.sec.gov/Archives/edgar/data/1555365/000119312516642888/d220423dex991.htm.

43.     In early February 2016, a media report identified activist interest in, and speculated regarding a possible takeover of, WhiteWave. Proxy 26.

44.     At some point during the course of a regularly-scheduled March 10 -11, 2016, Board meeting,  Engles finally told the Board about the contacts with Faber and Cabanis.  Engles also discussed the contact he apparently had with certain Company stockholder, though the Proxy fails to disclose which stockholder and what the contact was about. Proxy 27.

45.     At this meeting, Goldman Sachs made a presentation about the following: (i) reviewed the mergers and acquisitions environment generally and with respect to the food industry in particular, (ii) provided financial perspectives regarding WhiteWave and its stock performance, (iii) provided perspectives regarding potential alternatives available to WhiteWave including a potential acquisition transaction being contemplated by WhiteWave, (iv) reviewed third parties that might have interest in exploring a potential transaction with WhiteWave, including Danone, and (v) discussed alternative paths that WhiteWave might pursue if its board of directors were to determine to pursue a proposal for a transaction with the Company. *Id.*

46.     The board of directors discussed Danone's interest in potential strategic transactions and authorized management to engage in further discussions with Danone to ascertain if Danone was interested in making a proposal for a transaction with the Company and what the nature of that transaction would be. *Id.*

47.     On March 18 and 31, 2016, now finally acting with Board authorization,  Fugger contacted Cabanis and advised her that WhiteWave was for sale to Danone and they discussed future contacts involving Engles.  *Id.*

48.     On April 6, 2016, Faber told Engles that Danone was interested in exploring a potential business combination transaction with WhiteWave, as he and Engles had discussed in

January. The Proxy fails to disclose that various types of transactions that Engles had proposed to Faber in January. Danone preferred an all cash going-private acquisition of the Company. They agreed that Fugger and Cabanis should be the ones to coordinate future contacts about the sale of WhiteWave to Danone.  Fugger and Cabanis continued to discuss the sale through April, 2016. Cabanis always emphasized that Danone sought exclusivity in its negotiations to acquire WhiteWave, to which Fugger apparently never objected or even discussed. Proxy 26-27.

49.     At an April 18, 2016, WhiteWave Board meeting, after an update from Engles on the Danone discussions, the Board authorized Engles to continue to engage with Danone. The Proxy fails to disclose the scope of Engles' and Fugger's authorization including whether economics of a potential transaction were discussed. Proxy 26.

50.     At the May 11, 2016, WhiteWave Board meeting, after an update on the Company's business and the Danone discussions, Goldman Sachs  presented the following: (i) provided financial perspectives on WhiteWave and the equity market and general business environment, (ii) reviewed the status of discussions with Danone and potential next steps in those discussions and (iii) reviewed the potential for interest by third parties in a transaction with WhiteWave, including factors indicating why Danone might be the party most interested in pursuing a transaction with WhiteWave, and potential process alternatives available to WhiteWave.  WhiteWave's Board then determined that management should continue discussions with Danone  and decided not to contact other potential bidders for the Company.  The Proxy discloses the following reasons for this decision: (i) uncertainty regarding whether Danone or any other party would be interested in an acquisition of WhiteWave that the Board would find sufficiently attractive to pursue, (ii) the fact that Danone was the only party that had stated its interest in an acquisition of WhiteWave and the Board's belief, taking into account the perspectives provided by Goldman Sachs and WhiteWave's

management, that Danone was the company best positioned to provide the highest value for WhiteWave in light of the complementarity of the two companies' businesses, opportunity for synergies and potential for earnings accretion from a transaction, (iii) the belief that if WhiteWave were to contact other parties, there was a significant risk that Danone would not make a proposal and (iv) the potential that exclusivity could be used to obtain a higher price from Danone than might be available otherwise.

51.     At the May 23, 2016 Board meeting, Goldman Sachs reviewed its analysis of a potential merger with Danone and the potential interest of other entities in acquiring the Company. The Proxy emphasizes, when discussing this meeting and a prior meeting, that the Board considered the fact that no company other than Danone had reached out about an acquisition of WhiteWave. Proxy 28. However, the Proxy fails to disclose if the Board ever was told that Engles was the one that originally initiated the contact with Danone specifically to discuss the sale of the Company to Danone. No other entities were aware based on publicly available information that Defendants were in negotiations and/or considering the sale of the Company. Nevertheless, the Board decided to effectively grant Danone exclusivity and not contact other parties for fear that Danone would not make offer if it conducted a market check and its erroneous view that Danone was the only interested entity. Proxy 28.

52.     On May 24, 2016, Fugger continued his globe-trotting secret sales negotiations with Cabanis, this time meeting in Amsterdam. Presumably, Fugger told Cabanis that the WhiteWave Board would concede to deal exclusively with Danone, but without signing a formal exclusivity agreement, and they discussed terms of a limited confidentiality agreement to allow for the exchange of some internal financial information.  Proxy 28.  They later discussed, and agreed on, a nondisclosure agreement with a standstill and other confidentiality commitments to

allow for a WhiteWave management presentation to Danone. The Company began to provide Danone with internal financial information.  Proxy 29.

53.     The Proxy provides that media reports identified WhiteWave as a potential takeover target, but that no entity contacted it.  Proxy 29. This disclosure presumably is intended to justify the Board's election to deal exclusively with Danone. In fact, as mentioned above, the media reports in June 2016, actually included that a significant investor was increasing its position suggesting that the Company could become an acquisition or an insurgency (through a Proxy contest) target in the months to come.

54.     On June 24, 2016, Danone presented a formal proposal to acquire the Company for $53.00. The Board met on June 26, 2016 to consider the proposal, including apparently to review the Company's prospects as a standalone company.  *Id.*  The Board instructed Goldman Sachs, after its presentation regarding the proposal, to seek a higher bid from Danone.  Management also was instructed to seek a higher proposal. Proxy 29-30..

55.     At a meeting on June 29, 2016, the parties hammered out the final economic terms of the transaction, after what appears to have been some mild back-and-forth negotiations in a single day, agreeing to a final merger consideration of $56.25. This price and Engles' agreement to recommend this price the WhiteWave Board, was reached at or around the time that Danone agreed to recommend Engles for Danone board seat.   Proxy 30.

56.     The next day, WhiteWave agreed to the $56.25 offer and formally agreed to grant exclusivity to Danone for two week while the parties worked out the remaining terms of a transaction. Proxy 30.  No effort appears to have been made during these final negotiations to seek a "go-shop" clause in the merger agreement to allow WhiteWave to engage in a limited market check. Proxy 31.

57.     Based on a purported news leak that Cabanis told Fugger about that Danone was considering a transaction, WhiteWave agreed to accelerate the conclusion of discussions and wrap up the deal by July 7, 2016, which was accomplished.   *Id.*

58.     On July 6, 2016, the WhiteWave Board met and voted to approve the Proposed Transaction. Proxy 31.

**C.     The Proposed Transaction Undervalues WhiteWave Shares**

59.     The Merger Consideration offered to WhiteWave's public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.  The Proposed Transaction will deny Class members their right to fully share equitably in the true value of the Company.  Indeed, the benefits obtained by Danone through the Proposed Transaction outweigh those provided in the Merger Consideration.  In the July 6, 2016 joint press release announcing the Proposed Transaction, Danone's CEO Faber recognized the great value it was obtaining from the Merger by enhancing Danone's growth profile and reinforcing its resilience through a broader North American platform. The combination of the two companies, Faber believes, will create significant value for Danone stockholders.

60.     As noted above, for the last several earnings results reports, the Company had reported positive results and growth trends and had beaten Wall Street estimates.

61.     Thus, on November 8, 2015, the Company released is 2015 third quarter results.[10] For the third quarter 2015 the Company reported: (i) total Net Sales Increased 17%; (ii) adjusted

---

[10] www.sec.gov/Archives/edgar/data/1555365/000155536515000026/ex-991q32015earningsrelease.htm.

Constant Currency Net Sales Increased 20%; (iii) adjusted Organic Constant Currency Net Sales Increased 11%; (iv) adjusted Total Operating Income Increased 25%, Reflecting Continued Operating Margin Expansion; (v) adjusted Diluted Earnings per Share of $0.33, Excluding China Joint Venture Investments; (vi) increasing FY 2015 Adjusted Diluted Earnings Per Share Guidance to $1.17 to $1.18 and Constant Currency Guidance to $1.22 to $1.23, Excluding China Joint Venture Investments; (vii) reiterating expectation of approximately 10% Organic Constant Currency Growth for FY 2015.

62.     The Defendant Engles stated in the press release announcing the results:

Our strong growth momentum in the first half of the year accelerated in the third quarter, with 17 percent sales growth resulting in our first ever quarter of sales over a billion dollars … Our market leading brands and industry leading innovation continue to drive strong organic growth across our businesses resulting in 11 percent adjusted organic constant currency net sales growth in the quarter. We also continued to execute on our strategic initiatives by closing on our Vega and Wallaby acquisitions, and strategically modified our credit facility to support our continued growth plans. Our focus remains on changing the way the world eats for the better, while delivering outstanding growth in sales and profits to our investors.

63.     The Individual Defendant Engles stated during the earnings call:

I'm pleased to report that our strong growth momentum in the first half continued into the third quarter. Despite ongoing currency headwinds, we delivered top-line growth of 17%, driven by strong organic growth across our core businesses, combined with contributions from acquisitions….

Our net sales increased to $1 billion, marking WhiteWave's first time to reach this quarterly sales milestone. On a constant currency basis, our net sales growth was 20%. After excluding the results from acquisitions within the past year, our organic constant currency growth was 11%, behind growth in all of our segments. We leveraged this strong top-line growth into operating income growth of 25%. On a constant currency basis, our operating income increased 31%, with 85 basis points of margin expansion. This strong operating performance was achieved despite an operating income decline in our Americas Fresh Foods segment due to higher costs, as we focused on regaining distribution and improving our customer service levels.

…

We continue to focus on launching innovative products, growing our brands and categories through continued marketing investments, and broadening our

geographic reach beyond our core markets and our distribution reach beyond traditional channels to drive ongoing growth. We are also selectively adding key brands to our portfolio, as seen with the recent acquisitions of Vega and Wallaby. Both brands are still nascent with opportunities for further innovation, distribution and growth. We remain focused on growing our core brands and categories while strategically adding more.

In summary, we enter the fourth quarter executing on our strategic initiatives with continued momentum across our core businesses and an enhanced capital structure to support our growth. We remain focused on finishing 2015 strong and delivering on our increased earnings targets and creating additional value for our shareholders.

…

Based on our year-to-date results and expectation of continued growth across our core businesses along with the modest contribution of Wallaby, we are increasing our top-line and bottom-line guidance for 2015.

64.     On February 11, 2016, the Company released its 2015 fourth quarter and year-end results as follows: (i) total net sales increased 13% and adjusted constant currency net sales increased 15% in both Q4 and Full Year 2015; (ii) adjusted organic constant currency net sales increased 9.5% in full year 2015; (iii) adjusted total operating income increased 30% in Q4 and 24% in full year 2015, reflecting continued operating margin expansion; (iv) adjusted diluted earnings per share increased 31% in Q4 to $0.36 and 19% in full year 2015 to $1.19, excluding China joint venture investments; (v) forecasting full year 2016 adjusted diluted earnings per share of $1.33 to $1.37 and $1.38 to $1.42 on a constant currency basis, excluding China joint venture investments; (vi) expecting high single-digit organic constant currency net sales growth for full year 2016.[11]

65.     The Defendant Engles stated in the press release announcing the results:

Our strong fourth quarter results closed out another record year at WhiteWave. We continued to generate significant organic growth behind our core brands, with our recent acquisitions delivering on our growth expectations … As part of our record 2015 accomplishments, we completed the two highly strategic acquisitions of Vega

---

[11]www.sec.gov/Archives/edgar/data/1555365/000155536516000033/ex-991q42015earningsrelease.htm.

and Wallaby, opened a new state-of-the-art research and development facility, launched an array of new and innovative products and further expanded and improved our supply chain capabilities. With our broadened portfolio of brands in growing categories that are aligned with enduring consumer trends, we look forward to delivering another year of strong results in 2016.

66.     As noted above,  on May 10, 2016, the Company reported record results for the first quarter 2016 that included the following: (i) total net sales increased 14% and constant currency net sales increased 15% in Q1; (ii) organic constant currency net sales increased 8% in Q1; (iii) adjusted total operating income increased 21% in Q1, reflecting continued operating margin expansion; (iv) adjusted diluted earnings per share increased 17% in Q1 to $0.28, excluding China joint venture investments; (v) increasing full year 2016 adjusted diluted earnings per share guidance to $1.38 to $1.41 and $1.42 to $1.45 on a constant currency basis, excluding China joint venture investments; (vi) reiterating high single-digit organic constant currency net sales growth for full year 2016.[12]

67.     The Defendant Engles stated in the press release announcing the results:

 We are off to a very good start in 2016, delivering results ahead of our expectations with healthy topline growth and operating performance … Our robust organic constant currency sales growth in the first quarter was driven by strong growth across our legacy platforms in traditional retail outlets, along with increasing contributions from away-from-home channels and our growing international presence. Our Vega and Wallaby acquisitions also continued their robust growth trends, positively impacting our results as well. Our strong start to the year has led us to increase our guidance for full year 2016.

68.     Commenting on the revised increased guidance for 2016 during the earnings calle, the Company's  Executive Vice President and Chief Financial Officer stated the following:

Based on our first quarter results and our continued growth expectations for 2016, we are increasing our guidance. On the top-line, we now anticipate our constant currency net sales growth of between 11% to 12% for the full year, with 12% to

---

[12] www.sec.gov/Archives/edgar/data/1555365/000155536516000040/ex-991q12016earningsrelease.htm.

13% growth in the second quarter. Based on current foreign exchange rates, we expect this top-line growth to translate on a U.S. dollar reported basis to 10.5% to 11.5% growth for the full year and 11.5% to 12.5% in the second quarter. Our guidance reflects continued expectations for high single-digit organic constant currency growth for the year.[13]

69.     Engles also stated on the earnings call:

We have built a portfolio that is well aligned with consumer trends and we expect that those trends coupled with our continued innovation and brand building will support our future growth. Over the rest of 2016, we remain focused on driving growth across our core businesses, launching innovative new products, integrating and optimizing our recent acquisitions, expanding our geographic presence, broadening our distribution and channel reach, and leveraging our significant invested capital in order to deliver against our plans for the year. [14]

70.     Despite these very positive results and forecasts for continued growth, the Board chose to focus its efforts in 2016 on selling the Company to Danone, first by bringing on the Defendant Anthony J. Magro to the Board of Directors in January, 2016, and second by allowing Engles to negotiate exclusively with Danone. Magro is a senior advisor of Evercore, an investment banking firm, and the Company publicly touted his expected contribution to identifying a way to sell the Company.

**D.      The Preclusive Deal Protection Devices**

71.     Despite WhiteWave's prospects for future profitability and growth, Defendants targeted the sale of the Company only to WhiteWave and agreed to onerous deal provisions and other agreements to ensure a sale only to WhiteWave.   These onerous and preclusive deal protection devices operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

---

[13] http://seekingalpha.com/article/3973809-whitewave-foods-wwav-gregg-l-engles-q1-2016-results-earnings-call-transcript?part=single.

[14] *Id.*

72.     The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize stockholder value, including soliciting alternative acquisition proposals or business combinations.  The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations.

73.     Specifically, Section 6.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by WhiteWave.  The Company also must terminate any and all prior or existing discussions with other potential suitors.

74.     Additionally, Section 6.3(c), (f), and (g) of the Merger Agreement grants Danone recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three (3) business days to negotiate with Danone to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.   Section 6.3(c) requires the Company to notify Danone within 24 hours that it has received an inquiry, proposal or offer.

75.     To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $42 million. Section 8.5(b). The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide WhiteWave stockholders with a superior offer.

76.     These provisions cumulatively discourage bidders from making a competing bid for the Company.

**E.      The Incomplete & Materially Misleading Proxy**

77.     On July 29, 2016, WhiteWave filed the Proxy with the SEC in connection with the Proposed Transaction.   The Proxy misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy fails to provide the Company's stockholders with material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Goldman Sachs.  As a result of the incomplete and misleading Proxy, WhiteWave stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.**

78.     The Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the *Background of the Merger*  section contained on pages 26-31 of the Proxy  is materially deficient in that it fails to disclose the following information:

(a)     Whether Engles and/or Fugger had authorization from the WhiteWave Board to discuss a potential strategic  transaction between the Company and Danone with Faber on September 9, 2015,  January 14, 2016 and/or any other contacts, meetings or discussions prior to the March 10-11, 2016 Board meeting (Proxy 26);

(b)      The basis for Fugger's involvement in the sales negotiations with Danone throughout the sales process (Proxy 26-30);

(c)      The identity of the stockholder with which Engles had contact and discussed with the Board at the March 10-11, 2016 Board meeting and/or dinner (Proxy 27);

(d)      The "financial perspectives" that Goldman Sachs discussed with the Board at the March 10-11, 2016 Board meeting,  whether Goldman Sachs was provided Company projections for its consideration Company's valuation at this meeting and whether those projections later were updated for purposes of Goldman Sachs' fairness opinion (see Proxy 43, note 1) and if so the circumstances for the update, and whether Goldman Sachs recommended and/or identified specific entities to contact regarding a potential strategic transaction with the Company (Proxy 27);

(e)       Whether on March 10-11, 2016, the Board discussed and/or gave guidance to Goldman Sachs and/or Engles and/or Fugger regarding  the economics of a potential transaction with Danone (Proxy 28);

(f)       The rational for engaging Goldman Sachs as the Company's financial advisor, whether the Board considered and/or vetted other financial advisors, rational for the 100% contingent fee payable to Goldman Sachs, which is contingent on consummation of the Proposed Transaction, the fees Goldman Sachs has earned from prior work for WhiteWave, and whether Goldman Sachs during the sales process described in the Proxy, or any

Goldman Sachs personnel working on the Danone transaction held positions in Danone and/or any subsidiaries and/or affiliates of Danone;

(g)     The types of strategic transactions Engles discussed with Faber at the January 14, 2016 meeting (Proxy 26);

(h)     The factors identified by Goldman Sachs at the May 11, 2016 Board meeting indicating why Danone might be the party most interested in pursuing a strategic transaction with the Company and whether Goldman Sachs indicated that there were other companies that might also be interested in a strategic transaction with the Company at the time of the May 11 Board meeting  (Proxy 28) or any subsequent Board meetings (e.g., May 23, 2016)(Proxy 28);

(i)     The rationale for entering into the short form non-disclosure agreement without the standstill provision (Proxy 29);

(j)     The Board's rationale for not negotiating a "go-shop" provision in the Merger Agreement (Proxy 31;

(k)     Whether WhiteWave provided Danone with its internal financial projections/measures prior to entering the Merger Agreement and whether those projections/measure were identical to the projections/measures provided to Goldman Sach for purposes of its fairness opinion;

(l)     All of Goldman Sachs' engagements, work performed for (and fees earned) and/or equity holdings in (i) the Company, and/or (ii) Danone (and any and all affiliates and/or subsidiaries).

79.     The omission of the above information renders statements in the Proxy "Background of the Merger" and "Recommendation of the WhiteWave Board of Directors and Reasons for the Merger" sections false and/or materially misleading in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**Materially Incomplete and Misleading Disclosures Concerning WhiteWave's Financial Information and Banker Analysis**

80.     The Proxy fails to properly and adequately disclose WhiteWave's non-public projected financial data and/or assumptions relating to the Company's future performance.   The Proxy makes clear, that both the Board and Goldman Sachs relied continuously throughout the sales process on this information to reach a decision to enter into the Merger Agreement with Danone and that the Board relied on this information to recommend that WhiteWave stockholders vote in favor of the Proposed Transaction for the Merger Consideration. The omission of this information renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Goldman Sachs. This omission renders the Proxy false and/or misleading as this information was relied on and utilized by the Board and Goldman Sachs.

81.     The section of the Proxy entitled "Reasons for the Merger", discloses the Board's bases for and/or information relied on to recommend that stockholders vote in favor of the Proposed Transaction, including the following: (i) the Company's business and operations, **strategic business plans** and **financial projections** (Proxy 32); (ii) the c**ontinued operation of WhiteWave on a standalone basis**, based on the board of directors' understanding of WhiteWave's business and operations, its current and historical results of operations, and **financial**

**prospects** and conditions, and the determination that continued operation of the Company on a standalone basis **was not sufficiently likely** to produce, on a risk-adjusted basis, **values that would create more value** for stockholders than the current all-cash consideration offered by Danone (Proxy 33); and (iii) the financial analysis reviewed by representatives of Goldman Sachs on July 6, 2016 with the Board at its meeting on July 6, 2016. Proxy 31, 33.

82.     The Board's recommendation as reflected in the Proxy section entitled "Recommendation of the WhiteWave Board of Directors and Reasons for the Merger" ("Recommendation") is false and/or misleading because, as alleged above, the Board clearly utilized and/or relied on the Company's non-public data regarding its future performance to recommend that stockholders vote in favor of the Proposed Transaction, but the Proxy fails to sufficiently disclose this information or the information that is disclosed is false and/or misleading. Proxy 42-43.  Absent the data on the Company's future performance, stockholders cannot to weigh and gauge the Board's recommendation.  This material information must be disclosed to stockholders prior to any stockholder vote on the Proposed Transaction.

83.     The Company's financial projections through 2018, and extrapolations to 2026 ("Forecasts"),  utilized and relied on for the Recommendation, which in part are non-GAAP measures with undisclosed unique company-specific adjustments and assumptions, including net sales, adjusted EBIT, adjusted EBITDA and unlevered free cash flows (Proxy 43) are false and/or misleading because the Forecasts are not inclusive of all Company projections relied on for the Recommendation and fail to include management assumptions that were utilized to create these metrics including the following were not disclosed:

- The "numerous assumptions" used by management are not identified or even described in the Proxy (Proxy 42);

- The 2016 forecasts, includes Q1 2016 actual figures plus forecasts for the balance of the year but exclude "potential future adjustments for 2016" and fails to disclose the future adjustments are (Proxy, 43);

- Note 1 to the Forecasts discloses that the Forecast table on page 43 represents "selected measures" of the Company's Forecasts through 2018 that were provided to Danone in May 2016 and to Goldman Sachs for its fairness opinion (Proxy 43, note1) and these same "selected measure" were extrapolated to 2026 and utilized by Goldman Sachs (Proxy 43, note 2);

- The GAAP measure, net income was utilized, relied on and reflected in the Forecasts but that projection is not disclosed (Proxy 43, note 3, note 4) ;

- The adjustments to adjusted EBIT and adjusted EBITDA are not disclosed including projected stock-based compensation expenses, SAP transition costs in our Fresh Foods business, grants in connection with our initial public offering and other non-cash stock-based compensation costs, mark-to-market adjustments on hedging transactions, and costs to manage and losses incurred on the investment related to our China joint venture with Mengniu (*Id.*);

- The Company's projected capital expenditures and changes in net working capital accounts, utilized to create the unlevered free cash flows are not disclosed(Proxy 43, note 5, and note 6 (Goldman Sachs' 2016 calculation));

84.     The failure to disclose these inputs and/or assumption, to explain reconciliation of GAAP and non-GAAP financial projected data for purposes of reporting the financial data in the Proxy violates SEC regulatory mandates and policy under Regulation G, item 1015 of Regulation M-A and other SEC rules and policy statements, and renders the Forecasts and Goldman Sachs'

valuation analysis that utilized such data, false and/or misleading, and renders the Board's Recommendation false and/or misleading.   Further, the Proxy discloses that the Individual Defendants acted on and issued its recommendation for WhiteWave stockholders to vote in favor of the Proposed Transaction based on consultation with counsel, and therefore they were fully apprized of their legal and regulatory obligations to disclose and reconcile GAAP and non-GAAP projections and otherwise disclose Company Forecasts in an accurate and non-misleading manner. Due to the failure accurately and appropriately to disclose the Company's financial forecasts as described above, the following is rendered false and/or misleading (Proxy at 43):

### CERTAIN FORECASTS AND EXTRAPOLATIONS (1)

| USD$ in millions | Forecasts (1) | | | Extrapolations (2) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016E* | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E |
| Net Sales | $4,346 | $4,723 | $5,101 | $5,484 | $5,867 | $6,249 | $6,624 | $6,988 | $7,338 | $7,668 | $7,974 |
| Adjusted EBIT (3) | 454 | 539 | 628 | 716 | 804 | 897 | 994 | 1,083 | 1,174 | 1,266 | 1,356 |
| Adjusted EBITDA (4) | 596 | 703 | 808 | 913 | 1,015 | 1,125 | 1,236 | 1,342 | 1,446 | 1,553 | 1,655 |
| Unlevered Free Cash Flow (5) | 78[6] | 224 | 338 | 389 | 446 | 511 | 576 | 641 | 705 | 773 | 838 |

Source: WhiteWave management.

\* Represents Q1 2016 actual figures plus the balance of the year forecast for 2016, excluding potential future adjustments for 2016.

(1) This table reflected selected measures from the WhiteWave Forecasts from 2016E through 2018E as provided to Danone in connection with its due diligence review of a possible transaction in May 2016 and as provided to Goldman Sachs in connection with its financial analyses summarized under "— *Opinion of WhiteWave's Financial Advisor*".

(2) Extrapolations represent WhiteWave management's estimates for the business from 2019E through 2026E. These extrapolations were provided to Goldman Sachs in connection with its financial analyses summarized under "— *Opinion of WhiteWave's Financial Advisor*", but were not provided to Danone.

(3) Adjusted EBIT is defined for purposes of the Forecasts as net income before interest expense, income tax expense; and adjusted for the impact of certain non-recurring transaction, restructuring, transition, integration and other similar costs, including SAP transition costs in our Fresh Foods business, grants in connection with our initial public offering and other non-cash stock-based compensation costs, mark-to-market adjustments on hedging transactions, and costs to manage and losses incurred on the investment related to our China joint venture with Mengniu. Adjusted EBIT is a non-GAAP financial measure and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flow or as a measure of liquidity.

(4) Adjusted EBITDA is defined for purposes of the Forecasts as net income before interest expense, income tax expense, depreciation and amortization; and adjusted for the impact of certain non-recurring transaction, restructuring, transition, integration and other similar costs, including SAP transition costs in our Fresh Foods business, grants in connection with our initial public offering and other non-cash stock-based compensation costs, mark-to-market adjustments on hedging transactions, and costs to manage and losses incurred on the investment related to our China joint venture with Mengniu. Adjusted EBITDA is a non-GAAP financial measure and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flow or as a measure of liquidity.

(5) Unlevered Free Cash Flow is defined for purposes of the Forecasts as "Adjusted EBIT" less income tax expense, plus depreciation and amortization, less capital expenditure and changes in net working capital accounts. Unlevered Free Cash Flow is a non-GAAP financial measure and should not be considered as an alternative to operating income or net income as a measure of operating performance or cash flow or as a measure of liquidity. Assumptions made by WhiteWave's management in calculating unlevered free cash flows for purposes of the Forecasts related to: net sales growth rates, operating margins, future tax rates, capital investment requirements and working capital metrics. WhiteWave's management made the foregoing assumptions in calculating the unlevered free cash flows for purposes of the Forecasts in foregoing manner because the calculations were intended to be used to demonstrate potential projected amounts of cash generated from an operational perspective in the short- to medium-term and not as a potential valuation metric.

(6) For use in connection with its financial analyses summarized under "— *Opinion of WhiteWave's Financial Advisor*", Goldman Sachs arithmetically calculated the 2016 unlevered free cash flow using the information contained in the Forecasts and the same methodology that WhiteWave management used in calculating unlevered free cash flows in each other year of the Forecasts and described in Footnote (5) to the table above. Goldman Sachs' calculation of the 2016 unlevered free cash flow shown in the table above was reviewed by and approved by WhiteWave management.

85.     The Proxy also discloses that Goldman Sachs relied on the same false and/or misleading Forecasts described above creating certain valuations used to render its fairness opinion (Proxy, 36), including the *Illustrative Present Value of Future Share Price Analysis* (Proxy, 38), the *Illustrative Discounted Cash Flow Analysis* (Proxy, 38).

86.     However, the above information is not accurately and/or properly disclosed including in accordance with SEC Regulation G, 17 C.F.R. §244.100, item 10(e) of Regulation S-K, and/or item 1015 of Regulation M-A, by utilizing and disclosing non-GAAP financial measures, metrics and assumptions without reconciling such non-GAAP financial data with the corresponding GAAP measure as required, without disclosing the numerous adjustments and assumptions that were utilized to calculate the non-GAAP measures, which renders the information contained in the Proxy false and misleading in violation of Section 14(a) and Rule Rule 14a-9 of the Exchange Act.

87.     The failure to properly and accurately disclose this information renders Proxy false and/or misleading.  Without this information, WhiteWave stockholders cannot properly determine the projected financial information utilized by Goldman Sachs in its analysis, which undermines the credibility of the Goldman Sachs fairness opinion and renders the content and substance of

said fairness opinion false and/or misleading, and negatively impacts stockholders' ability to weigh and measure the Goldman Sachs fairness opinion.

88.     The failure to disclose the information in ¶¶80-85 above reflecting WhiteWave's projected future performance metrics also specifically renders the Proxy false and/or misleading with respect to Goldman Sachs' implied valuation reference range per share in its *Illustrative Present Value of Future Share Price Analysis* (Proxy 38) and *Discounted Cash Flow Analysis* (p. 38).

89.     Goldman Sachs' *Discounted Cash Flow Analysis* further is rendered false and or misleading because the Proxy fails to disclose of the inputs or assumption utilized to determine perpetuity growth rates ranging from 2.5% to 3.5% and discount rates ranging from 7.5% to 9.5%, including: (i) the identity, quantity, and source of the weighted average cost of capital ("WACC") assumptions utilized; (ii) the rational for utilizing discount rates 7.5% to 9.5%, and (ii) whether the perpetuity growth rates correspond to assumed terminal pricing multiples.

90.     With respect to the *Illustrative Present Value of Future Share Price Analysis* (Proxy, 38), the Proxy fails to disclose (i) basis for excluding  future values beyond 2018; (ii)  the means by which Goldman Sachs arrived at an illustrative discount rate of 10.0% and (iii) the manner in which cost of equity is calculated.

91.     With respect to Goldman Sachs' *Selected Transactions Analysis* (Proxy 39, the Proxy fails to disclose (i) the observed transaction-by-transaction enterprise values; (ii) financial metrics; and (iii) whether other multiples and/or transaction premiums were examined (if so, they should be disclosed). The failure to make the aforementioned disclosures renders the following false and/or misleading:

The following table presents the results of this analysis:

| | Selected Transactions | | Proposed |
| | Range | Median | Transaction |
|---|---|---|---|
| EV/LTM Adjusted EBITDA | 12.1x - 23.7x | 15.3x | 23.4x |

Based on its review of the selected transactions and its professional judgment and experience, Goldman Sachs applied illustrative enterprise value to last twelve month adjusted EBITDA multiples ranging from 12.1x to 23.7x to WhiteWave's last twelve month adjusted EBITDA (which last twelve month adjusted EBITDA is pro forma for WhiteWave's acquisitions of Sequel Naturals Ltd and Wallaby Yogurt Company, Inc. and excludes losses related to WhiteWave's China joint venture with Mengniu) to derive illustrative values per share of WhiteWave common stock ranging from $24 to $57 (values rounded).

92.     The Proxy is false or misleading due to the omissions identified above in paragraphs 77 through 91.  In addition to violating the Federal Securities laws and SEC rules, regulations and policy statements regarding the use and/or emphasis of non-GAAP measures, data, inputs assumptions and metrics without proper reconciliation with GAAP equivalents - which render such information misleading on its face - Company stockholders cannot evaluate for themselves whether the financial analyses performed by Goldman Sachs were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, stockholders require this information in order to fully evaluate the extent to which Goldman Sachs's opinions and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

## COUNT I

### On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act
### Against the Company and the Individual Defendants

93.     Plaintiff repeats and realleges each allegation set forth herein.

94.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.

95.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

96.     Specifically, the Proxy violates Section 14(a), Rule 14a-9 and Regulation G because it omits material facts as set forth above which renders the statements and information identified above false and/or misleading.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

97.     The misrepresentations and omissions in the Proxy are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

98.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

### Claims for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

99.     Plaintiff repeats and realleges each allegation set forth herein.

100.     The Individual Defendants acted as controlling persons of WhiteWave within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the WhiteWave, and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

101.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.    The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.    Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

103.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.    The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

104.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

105.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

106.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives and his counsel as Class Counsel;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.      Rescinding, to the extent already implemented, the Proposed Transaction  or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff  and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATE: August 8, 2016                      Respectfully submitted,

                                          */s/ Rusty E. Glenn*
                                          Rusty E. Glenn
                                          **THE SHUMAN LAW FIRM**
                                          600 17th Street, Suite 2800 South
                                          Denver, CO 80202
                                          Telephone: (303) 861-3003
                                          Facsimile: (303) 536-7849
                                          Email: rusty@shumanlawfirm.com

                                          Kip B. Shuman
                                          **THE SHUMAN LAW FIRM**
                                          Post-Montgomery Ctr.
                                          One Montgomery Street, Ste. 1800
                                          San Francisco, CA 94104
                                          Telephone: (303) 861-3003
                                          Facsimile: (303) 536-7849
                                          Email: kip@shumanlawfirm.com

                                          *Local Counsel for Plaintiff*

                                          **FARUQI & FARUQI, LLP**
                                          James M. Wilson, Jr.
                                          685 Third Ave., 26th Fl.
                                          New York, NY 10017
                                          Telephone: (212) 983-9330
                                          Facsimile: (212) 983-9331
                                          Email: jwilson@faruqilaw.com

                                          **MONTEVERDE & ASSOCIATES PC**
                                          Juan E. Monteverde
                                          The Empire State Building
                                          350 Fifth Avenue, 59th Floor
                                          New York, NY 10118
                                          Ph. (212) 971-1341
                                          Cell (305) 205-8284 or (646) 522-4840
                                          Email: jmonteverde@monteverdelaw.com

                                          *Attorneys for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, _JANICE_ _L. MALKOFF_ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against The WhiteWave Foods Company. ("WhiteWave") and the other named defendants and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in WhiteWave securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this _9_ day of August, 2016.

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| PURCHASE | 11/10/14 | 100 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |